# AFFIDAVIT

STATE OF WEST VIRGINIA

COUNTY OF WOOD, to-wit:

I, John Reese, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. This affidavit is made in support of an application for a search warrant to search the premises as more particularly described in Attachment A located at 635 Hill Street, Parkersburg, Wood County, West Virginia. Based on the facts set forth herein, probable cause exists that evidence of violations of 21 U.S.C. §§ 841 – distribution of controlled substances and possession with intent to distribute controlled substances, and 21 U.S.C. § 856 – maintaining a drug-involved premises, fruits of that criminal activity, and property designed for use, intended for use, or used to commit those offenses are currently located at that location.

2. I have been employed as a Special Agent of the FBI since August 2014. I am currently assigned to the FBI Charleston Resident Agency, Charleston, West Virginia. I have received specialized training while attending the FBI Training Academy in Quantico, Virginia, concerning violations of the Controlled Substances Act within Title 21 of the United States Code. During my employment with FBI, I have been working daily as a Special

Agent and have been involved in several long-term investigations, including drug trafficking, public corruption, bank robbery, and criminal use of computers and the internet. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses enumerated in Title 21 U.S.C. §§ 841, 843, and 846, and I have been the affiant on search warrants, pen register trap and trace order applications (PRTTs), Title III wiretap affidavits and have made multiple arrests related to drug trafficking. Prior to working for the FBI, I was employed as a police officer with the city of Jackson, Tennessee for five years. During my time as a police officer I had experience in dealing with drug violations, assaults, rape, and various violent crimes. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

       3.     During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped

conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education and experience, I have become familiar with (a) the manner in which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. The information contained herein is based on my knowledge, training, and experience, my direct involvement in this investigation, and upon information relayed to me by other law enforcement agents, and other witnesses. Because this Affidavit is being submitted for the limited purpose of seeking a search warrant for the above-named property, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause.

BACKGROUND: ITEMS TO BE SEIZED

5. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a. Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled

substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

      b.    Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

      c.    Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

      d.    Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including,

but not limited to: placing assets in the names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

  e. Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for every day expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

  f. Individuals involved in narcotics trafficking often maintain weapons, firearms and ammunition on their person or in their residence and /or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as

5

for enforcement purposes during their narcotics and firearms dealings.

g. Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owing, frequenting or controlling the residence and premises.

h. Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i. Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j. Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information

relating to their drug trafficking business on computers and/or computer disks.

6. It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs and chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

<u>SEARCH PROTOCOL FOR CELLULAR TELEHONES AND PDAS</u>

7. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for

7

their subscribers to access their device over the internet and remotely destroy all of that data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. Conversations can be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

<u>PROBABLE CAUSE TO SEARCH RESIDENCE OF ANDREW HOPKINS</u>

8. On January 7, 2020, a federal grand jury returned an indictment against ANDREW HOPKINS for Possession with Intent to Distribute more than 50 grams of Methamphetamine. This charge was based on a traffic stop conducted by members of the Vienna Police

8

Department on May 19, 2019, on a Chevrolet Silverado driven by Andrew Hopkins. During a search of said vehicle, officers located an amount of methamphetamine within a container located on the center console of the vehicle as well as a smaller amount of methamphetamine on the person of Hopkins. Over $3,000.00 in United States currency was also located within the vehicle. Both amounts of methamphetamine were sent off for testing at the Drug Enforcement Administration Laboratory in Largo, Maryland. As a result, it was determined by a forensic scientist that a total of approximately 102g of 96% pure methamphetamine was seized from Hopkins during the traffic stop.

9. On January 9, 2020, HOPKINS was arrested at his residence, located at 635 Hill Street, Parkersburg, Wood County, West Virginia, on a warrant issued for the above-mentioned indictment. During the arrest, while securing the residence, agents observed digital scales and currency on a table in the garage of the residence in plain view. Also observed in the residence was a long rifle, laying on a desk in the living room.

CONCLUSION

10. Based on the above-stated information, probable cause exists that ANDREW HOPKINS engaged in drug trafficking activities in violations of 21 U.S.C. § 841(a)(1) - distribution and possession with intent to distribute controlled substances, and 21 U.S.C. § 856 - maintaining a drug-involved premises.

Probable cause exists that evidence of those offenses, fruits of those offenses, and property designed for use, intended for use, or used to commit those offenses are currently located at the residence of ANDREW HOPKINS as more fully described in Attachment A.

Further your affiant sayeth naught.

_____
JOHN REESE
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me, and subscribed in my presence, this _9th Day of January, 2020.

_____
Dwane L Tinsley
UNITED STATES MAGISTRATE JUDGE

## Attachment A

635 Hill Street, Parkersburg, Wood County, West Virginia, 26101, is described as a one story, single family residence. It has white siding with a red metal roof. There are two garage doors and two covered porches on the residence. There is a small detached outside building and approximately 13 vehicles parked on the property.





**Attachment B**

1.  Evidence of Drug Trafficking: Controlled substances, packaging materials, scales, cutting agents, presses, rubber bands, plastic bags, discarded wrappers, ledgers, bills of sale, owe sheets, lists of telephone numbers or other contact information, identifying information of customers and/or suppliers, documents related to the electronic transfer of money to include receipts for Western Union, MoneyGram and the like, prepaid debit cards, items used to detect police surveillance or to detect the presence of radio broadcasts, "bugs," or similar investigative equipment, items associated with the use of controlled substances such as smoking devices, needles, items with suspected drug residue;

2.  Evidence of Maintaining a Drug-Involved Premises: Utility bills, deeds, mortgage records, identification documents, mail, surveillance equipment to include DVR or similar recording devices;

3.  Evidence of Interstate Travel in Furtherance of Drug Trafficking including such items as car rental receipts, agreements and associated paperwork, GPS enabled devices, receipts for fuel, records of using hotel accommodations;

4.  Fruits of Criminal Activity: United States currency, all documents showing the purchase, ownership, lease (as lessor or lessee), or sale of any asset, personal or real to include

automobiles, boats, motorcycles or similar motorized conveyances to include deeds, titles, and bills of sale, cellular phones, electronic communication devices, ipads or tablets, drug ledgers and/or records relating to drug trafficking and drug debts;

5. All data found within electronic communication devices to include cellular phones, ipads or tablets, computers; and

6.   Firearms.